UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ST. PAUL FIRE & MARINE
INSURANCE COMPANY,                    CASE NO: 6:13-cv-1088-Orl-31TBS

          Plaintiff,

v.
                                                **DISPOSITIVE MOTION**

CYPRESS FAIRWAY CONDOMINIUM
ASSOCIATION, INC., a Florida corporation;
CYPRESS FAIRWAY LTD., a Florida corporation;
and VINELAND PARTNERS, LLC, a Florida corporation,

          Defendants.
_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

Plaintiff, St. Paul Fire & Marine Insurance Company ("ST. PAUL"), by and through counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 3.01, moves for final summary judgment. The grounds for this Motion are as follows:

1.      ST. PAUL issued to Winter Park Construction Co. ("WINTER PARK") policy number KK05800062 for the policy period from December 31, 1999 to December 31, 2000. The policy has a Contractors Commercial General Liability Protection part and a Contractors Umbrella Excess Liability Protection part. [Docs. 34-3, 34-4]. ST. PAUL subsequently issued to WINTER PARK policy number KK05800111 for the policy period from December 31, 2000 to December 31, 2001. The policy has a Contractors Commercial General Liability Protection part and a Contractors Umbrella Excess Liability Protection part. [Docs. 34-35, 34-36]. ST.

PAUL subsequently issued to WINTER PARK policy number KK05800159 for the policy period from December 31, 2001 to December 31, 2002. The policy has a Contractors Commercial General Liability Protection part. [Docs. 34-7, 34-8]. These Policies are collectively referred to as "the Policies" unless a specific policy year is referenced.

2.      Plaintiff ST. PAUL seeks summary judgment declaring that the liability insurance policies that it issued to WINTER PARK did not require ST. PAUL to defend and indemnify Cypress Fairway Ltd. ("CYPRESS") and Vineland Partners LLC ("VINELAND") against the allegations of the Second Amended Complaint in the case entitled *Cypress Fairway Condo. Assoc. v. Cypress Madison Ownership Co., et al.,* with respect to the Cypress Condominium Community in Orange County, Florida ("Underlying Litigation") because the policies do not cover claims for negligent supply of information. [Doc. 34-1].

3.      ST. PAUL also seeks summary judgment declaring that the Consent Final Judgment entered into among CYPRESS, VINELAND and the Cypress Fairway Condominium Association, Inc. ("ASSOCIATION") in the Underlying Litigation is unenforceable.

4.      The Consent Final Judgment is unenforceable against ST. PAUL because it does not apportion the claimed $2.5 million damages according to when any such damage occurred, the nature of any such damages, the extent to which any damages are covered or not covered under the ST. PAUL policies, and the value of any covered damages that might show whether such damages were

covered.

5.      At the time that CYPRESS and VINELAND entered into the consent judgment, there was no evidence permitting any such apportionment or in support of any valuation of such apportioned claims.[1]  The consent final judgment is therefore unreasonable and collusive/made in bad faith.

6.      VINELAND is not an insured under the Policies because WINTER PARK did not enter into a "specific written contract" with anyone requiring WINTER PARK to add VINELAND as an Additional Protected Person as required by the Policies' Additional Protected Persons Endorsement.  Thus, ST. PAUL owes no duty to defend and no duty to indemnify VINELAND.

7.      Plaintiff therefore moves for summary judgment in its favor and any further relief this Court may deem just and proper.

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### I.      Statement of material facts

### A.      Original construction of apartments

CYPRESS was a developer of an apartment complex. [M. Kean Dep. Trans. attached as Exhibit "A" at p. 18, l. 1-22].  CYPRESS hired WINTER PARK, a general contractor, to construct the apartments.  [*Id.*].  Construction of the apartments began in 1999 and was completed in 2000.  [Exhibit "A" at p. 38, l. 21-24].  VINELAND was the sole general partner of CYPRESS.  [Docs. 12, 34 at ¶ 8].

---

[1] There is still no evidence of any such apportionment as described below.

**B.     ST. PAUL  insurance policies**

ST. PAUL issued policies to WINTER PARK as set forth on pages 1 and 2.

**C.     CYPRESS' ownership of apartments and subsequent sale to a condominium developer**

After the ST. PAUL policies expired in 2002, CYPRESS sold the apartments to Cypress Madison Ownership Company, LLC ("MADISON"), a separate entity, in 2004. [Exhibit "A" at p. 19, l. 20-22].   Before purchasing the apartments, MADISON retained Asset Advisory Services, Inc. to conduct a building inspection in 2004.  [C. Norris Dep. Tran. attached as Exhibit "B" at p. 93, l. 6-18].   Asset Advisory Services, inc. did not observe any property damage in its pre-conversion building report. [*Id.*].

**D.     Sale of condominiums to the ASSOCIATION**

MADISON converted the apartments into condominiums and then sold the condominiums.   [Exhibit "A" at attached Exhibit "I" at p. 1 of 6].   CYPRESS and VINELAND were not involved in the sale of the property to any of the condominium unit owners.  [Exhibit "A" at p. 60, l. 19-25].

**E.     MADISON continued to manage the condominiums**

After MADISON sold the condominiums, MADISON continued to manage the condominiums.  [L. Ramos Dep. Trans. attached as Exhibit "C" at p. 28, l. 22-23]. MADISON stopped managing the condominium complex for the ASSOCIATION sometime in 2008.  [Exhibit "C" at p. 28, l. 22-25].  In turn, the ASSOCIATION hired another third-party management company to manage the condominium community. [Exhibit "C" at p. 29, l. 1-7].   The ASSOCIATION had no issues with the way MADISON conducted maintenance and repairs on the property.  [Exhibit "C" at p.

30, l. 19-23].

**F.      Expert reports ordered by the ASSOCIATION**

**1.      Morrison Hershfield's 2012 report**

The ASSOCIATION hired Morrison Hershfield ("Morrison") to assess the building envelope.    During four days in March 2012, Morrison inspected the condominium buildings.    [See, e.g., Exhibit "C" and attached Exhibit "C"].    In its October 2012 report, Morrison concluded that certain listed defects caused water intrusion damage that necessitated repair.    The 2012 Morrison report did not assess liability for those defects, did not assess the cause of the defects and conditions observed and did not provide a scope of repair or an estimate of repair costs.

**2.      The Defendants' expert's opinions in this case**

On December 30, 2014, Defendants served their Expert Witness Disclosure that disclosed Chris Norris then of Morrison Hershfield.    [Doc. 47-1].    Mr. Norris issued an evaluation of the building envelope components for defective construction, building code violations and variances from standard industry practices.    [*Id.*].    His report provided a scope of repair, but did not provide an estimate of the repair costs. [*Id.*].      Mr. Norris relied upon the 2012 Morrison site visit and photographs accompanying the 2012 Morrison report to render his opinions in this case in his December, 2014 report accompanying the ASSOCIATION's Rule 26(b) disclosures ("2014 Morrison report").   [Exhibit "B" at p. 68, l. 4-9; *Id.*].

Both the 2012 and 2014 Morrison reports do not provide any estimate of repair costs.   Nothing in either report apportions the $2.5 million according to when

any such damage occurred, the character of any such damages that might show them as covered or not covered under the ST. PAUL policies, and the value of any such covered damages.

### G. The Underlying Litigation

On or around April 5, 2010, the ASSOCIATION sued CYPRESS and VINELAND, among others, in the Underlying Litigation. [Doc. 34-1 at ¶¶ 1, 5]. The operative Second Amended Complaint against CYPRESS and VINELAND includes claims for building code violations, breach of statutory warranties, breach of contract, deceptive and unfair trade practices, negligence, negligent supply of information for the guidance of others and breach of fiduciary duty. [Doc. 34-1 at ¶ 2]. The Underlying Second Amended Complaint alleges that CYPRESS "owned the Condominium structures and operated them as apartments prior to their conversion." [Doc. 34-1 at ¶ 16]. The Underlying Second Amended Complaint further alleges that "Defendants and each of them failed to adequately investigate, plan, develop, design, construct, maintain, repair, or inspect the Condominium including the individual dwelling units therein." [Doc. 34-1 at ¶ 36].

The Underlying Second Amended Complaint alleges negligence against CYPRESS and VINELAND in Count V. Paragraph 81 alleges that CYPRESS and VINELAND were responsible for proper inspections, repairs, maintenance and alterations. [Doc. 34-1 at ¶ 81].

Count VI is entitled "Negligent Supply of Information for the Guidance of Others," and alleges that CYPRESS and VINELAND were responsible for and did

maintain and owned the condominiums prior to their sale to MADISON. [Doc. 34-1 at ¶ 93]. Count VI further alleges that during the development, renovation, marketing and sale of the condominium units, CYPRESS and VINELAND "made express and/or implied representations that the units and Condominium's common areas were constructed in a good and workmanlike manner and in accordance with at least the minimum standards of the applicable building codes and other industry standards and were free from water intrusion and related damages." [Doc. 34-1 at ¶ 95]. The Association and its members justifiably relied on the information supplied by CYPRESS and VINELAND. [Doc. 34-1 at ¶ 96].

### H.    Consent Final Judgment

On June 25, 2013, the ASSOCIATION notified ST. PAUL of its settlement with CYPRESS and VINELAND consisting of a Consent Final Judgment against CYPRESS and VINELAND for $2,500,000.00. [Docs. 12, 34 at ¶ 41; Docs. 34-12, 34-13]. The "Facts" section of the Consent Final Judgment at paragraph 3.1 states:

> The Association has asserted claims against CYPRESS and VINELAND alleging liability on the part of CYPRESS and VINELAND in connection with improper inspections, maintenance, and alterations of Cypress Fairway while same were apartments. The Association asserts that the inspections, repairs, maintenance, and alterations performed by CYPRESS and VINELAND, or that CYPRESS and VINELAND failed to perform, resulted in property damage to Cypress Fairway.

> ***

Doc. 34-13 at ¶ 3.1

The Consent Final Judgment states that the $2.5 million "represent[s] the reasonable allocation of the total cost of repair based on CYPRESS and

VINELAND's potential apportionment of fault for the property damage at Cypress Fairway." Doc. 34-13 at ¶ 5.1.

CYPRESS and VINELAND did not obtain ST. PAUL'S consent before entering into the Consent Final Judgment. VINELAND is not an Additional Protected Person.

## II.    Summary judgment standard

Motions for summary judgment should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Chartis Property & Casualty Co. v. Jassy*, , 2013 WL 5921541 (M.D. Fla. Nov. 4, 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.ed.2d 202 (1986)). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in light most favorable to the non-movant and draw all justifiable interferences in its favor. *Id.*

Under Florida law, when assessing an insurance dispute, the insured has the burden of proving that a claim against it is covered by the policy, and the insurer has the burden of proving an exclusion to coverage. *Id.* (citing *Great Am. Assur. Co. v.*

*Elliott*, 846 F.Supp.2d 1258 (M.D. Fla. 2012) aff'd, 511 Fed. Appx. 868 (11th Cir. 2013)).

### III.     Legal analysis

#### A.     Florida law is the proper substantive law here

A federal court sitting in diversity must look to the forum state's choice-of-law rules to determine the applicable law to the action. *Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1115 (11th Cir. 1996)). For purposes of determining contract interpretation, such as coverage issues under an insurance policy, Florida courts apply the law where "the last act necessary to execute" the contract took place. *See Sturiano v. Brooks,* 523 So. 2d 1126 (Fla. 1988); *Prime Insurance Syndicate, Inc.*, 363 F.3d 1089, 1093 (11th Cir. 2004). The place where the contract was executed is "generally considered to be the place where the policy is delivered." *Adolfo House Distributing Corp. v. Travelers Property and Casualty Ins. Co.,* 165 F.Supp.2d 1332, 1335 (S.D. Fla. 2001) (citing *Sturiano v. Brooks, supra,* and *Bloch v. Berkshire Ins. Co.,* 585 So. 2d 1137 (Fla. 3d DCA 1991)).

Nothing suggests that any other law besides Florida law applies to the ST. PAUL policies at issue in this case. Florida law applies to the interpretation of the policies because they were issued and delivered in Florida to its named insured, WINTER PARK. [Docs 34-3 – 34-8].

#### B.     Insurance policy construction under Florida law

Under Florida law, insurance contracts are construed as a whole and in accordance with their plain meaning. *Eastpointe Condo. I Assoc., Inc. v. Travelers*

*Cas. and Surety Co. of America*, 664 F. Supp. 2d 1281, 1287 (S.D. Fla. 2009); *see also Swire Pacific Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003). Clear and unambiguous provisions, including exclusions, must be enforced according to their terms. *Eastpointe*, 664 F. Supp. 2d at 1287. Courts should not strain to find ambiguity. *Id.* Florida does not follow the doctrine of reasonable expectations. *Deni Associates of Fl., Inc. v. State Farm Fire & Casualty Ins. Co.*, 711 So. 2d 1135, 1140 (Fla. 1998).

### C.    Duty to defend under Florida law

In Florida, an insurer's duty to defend is broader than its duty to indemnify. *See Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.,* 470 So.2d 810, 813 (Fla. 1st DCA 1985). Specifically, the duty to defend depends solely on the allegations in the complaint filed against the insured. *Trizec Props., Inc. v. Biltmore Constr. Co.,* 767 F.2d 810, 811–12 (11th Cir.1985). The complaint must allege facts which fairly bring the case within coverage even though ultimately there may be no liability on the part of the insured. *Id.* If the complaint alleges facts partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit. *Id.* The duty to defend is separate and apart from the duty to indemnify and the insurer may be required to defend a suit even if the later true facts show there is no coverage. *Id.*

Here, ST. PAUL owes no duty to defend CYPRESS or VINELAND with respect to Count VI. Count VI, entitled "Negligent Supply of Information for the Guidance of Others," does not allege an "event" that caused "property damage." [*See, e.g.,* Doc. 34-3, p. 49]. Instead, Count VI alleges that the ASSOCIATION and

its members sustained a loss insofar as they purchased real property whose value was materially affected by CYPRESS and VINELAND'S alleged negligent supply of information. Economic injuries, such as diminution in value of the project, do not meet the policies' definition of "property damage," which is "[p]hysical injury to tangible property, including all resulting loss of use that property." *See Colony Insurance Company v. Montecito Renaissance, Inc.*, 2011 WL 4529948, *3 (M.D. Fla. 2011 (citing *Mullin v. Travelers Indemnity Co. Of Connecticut,* 541 F.3d 1219, 1223–24 (10th Cir. 2008); *Johnson v. Amica Mut. Ins. Co.,* 733 A.2d 977, 979 (Me.1999)). A negligent misrepresentation does not amount to an "event" that caused "property damage." *Montecito* at *6.

Even if this Court were to find that the negligent supply of information is an "event," the alleged negligent supply of information did not cause the alleged "property damage*." See Jassy*, 2013 WL 592141 at * 4. Rather, the allegedly defective building envelope caused the "property damage." *See, e.g., Montecito*, 2011 WL 4529948 at *6 (the alleged negligent misrepresentations did not cause the alleged "property damage"; rather, "any such physical damage was caused by defective construction, and/or maintenance of the property").

### D.     Duty to indemnify under Florida law

ST. PAUL has no duty to indemnify the ASSOCIATION. "Florida law clearly states that liability of an insurer depends upon whether the insured's claim is within the coverage of the policy. This remains true even when the insurer has unjustifiably failed to defend its insured in the underlying action." *Spencer v. Assurance Co. of*

*Am.,* 39 F.3d 1146, 1149 (11th Cir.1994). "A determination of coverage, therefore, is a condition precedent to any recovery against an insurer." *Id.* (citing *Steil v. Fla. Physicians' Ins. Reciprocal,* 448 So.2d 589, 592 (Fla. 2d DCA 1984)).

The duty to indemnify is narrower than the duty to defend and depends upon actual coverage "measured by the facts as they unfold at trial or are inherent in the settlement agreement." *IDC Constr., LLC v. Admiral Ins. Co.,* 339 F.Supp.2d 1342, 1349 (S.D.Fla. 2004) (citations and internal quotation marks omitted); *see also State Farm Fire & Cas. Co. v. CTC Dev. Corp.,* 720 So.2d 1072, 1077 n. 3 (Fla.1998). Facts "inherent in" a settlement agreement are those "facts extant at the time the settlement was reached." *See Travelers Indem. Co. of Ill. v. Royal Oak Enters., Inc.,* 344 F.Supp.2d 1358, 1366 (M.D. Fla. 2004).

The CGL policies that ST. PAUL issued to WINTER PARK are "occurrence" policies, meaning that the insurance covers "property damage" that occurs during the policy period that is caused by an "event." [*See, e.g.,* Doc. 34-3, p. 49]. Thus, coverage under the ST. PAUL policies is not triggered until "property damage" occurs while the policy is in effect and that is caused by an "event." *See Trizec,* 767 F.2d at 812.

The Florida Supreme Court has not yet addressed when property damage "occurs" for coverage purposes, and trial courts apply varying trigger theories. *See Axis Surplus Ins. Co. v. Contravest Constr. Co.,* 921 F.Supp.2d 1338, 1346 (M.D. Fla. 2012) (Antoon, J.). Some courts apply the injury-in-fact trigger, "under which damage 'occurs' at the moment there is actual damage and the date of discovery is

irrelevant." *Id.; see also Trizec,* 767 F.2d at 813 ("[I]t is the damage itself which must occur during the policy period for coverage to be effective."). Others apply variations of the manifestation trigger, under which damage occurs when it is discovered or becomes discoverable. *See, e.g., Essex Builders Grp., Inc. v. Amerisure Ins. Co.,* 485 F.Supp.2d 1302, 1309 (M.D.Fla.2006); *Auto Owners Ins. Co. v. Travelers Cas. & Sur. Co.,* 227 F.Supp.2d 1248, 1266 (M.D. Fla. 2012) ("Florida courts follow the general rule that the time of occurrence within the meaning of an 'occurrence' policy is the time at which the injury first manifests itself.") (citation omitted). Recently, in a well-reasoned opinion, the Middle District of Florida adopted the injury-in-fact trigger. *See Trovillion Construction & Development, Inc.*, Slip Copy, 2014 WL 201678, *5 (M.D. Fla. Jan. 17, 2014).

Here, the Underlying Second Amended Complaint alleges that CYPRESS and VINELAND were responsible for proper inspections, repairs, maintenance and alterations of the condominiums as apartments. (Doc. 34-1 at ¶ 81).[2] The complaint is silent with respect to the exact date that the construction defects began to physically damage the condominiums, but the 2014 Morrison report indicates that the damage would have begun at some point within the first year or two of construction. [Doc. 47-1].

However, Defendant's expert Mr. Norris based his opinion about the timing of when the "property damage" occurred following a conversation he had with the

---

[2] During the ST. PAUL policy periods, any such duties of CYPRESS and/or VINELAND would have been to themselves, as CYPRESS and/or VINELAND continued to own the apartments during that time before the sale to MADISON.

Defendants' counsel.  Mr. Norris admitted that Defendants' attorney assisted in the wording of his opinion with respect to the timing of the property damage for his 2014 Morrison report:

> Q.     Did Mr. Guse provide any assistance to you with the wording of these opinions?
>
> A.     We discussed it on the telephone and likely, you know, through conversation, I'm not sure that some of the wording may have been influenced by what we talked about, but not the opinions themselves, if that makes sense.
>
> Q.     It does, sir.  Do you have any specific recollection of what Mr. Guse told you?
>
> A.     I'm thinking back in time here.  I think one of the things we talked about was the – you know, essentially the time of the, you know, the occurrence of – of defects and damage.
>
> Q.     Can you elaborate upon that for me, sir?
>
> A.     Specifically, you know, my opinion that's in my report that damage would have – it would have began to occur almost immediately upon completion of construction.

[Exhibit "C" at p. 21, l. 14-25; p. 22, l. 1-4].

 The prior 2012 Morrison report did not mention anything about the timing of when the "property damage" began, and Mr. Norris employed no reliable methodology in the 2014 Morrison report to arrive at his conclusion in this case.  Mr. Norris' knowledge of the circumstances that might cause damage and what and when such damage occurred is uncertain at best.  For instance, he admitted that water intrusion here would evaporate.  [Exhibit "B" at p. 46, l. 11-13].  Mr. Norris acknowledged that he could not describe why cellulose in wood breaks down (because he is not a biologist).  [Exhibit "B" at p. 42, l. 9-19].  Mr. Norris also testified

that wood with a moisture content above 19 percent will break down, but he did not know why this particular percentage was important or how long the wood would have to be saturated at 19 percent before it broke down. [Exhibit "B" at p. 42, l. 13-19]. His only explanation for the wood breaking down at the subject property was because of the "Orlando climate." [Exhibit "B" at p. 44, l. 11-24]. Mr. Norris did not claim any expertise in the microclimate of Orlando, Florida, and he is not a meteorologist. [Doc. 47-1].

E. **The Defendant ASSOCIATION carries the initial burden to prove that the consent judgment was objectively reasonable and made in good faith**

The ASSOCIATION, CYPRESS and VINELAND entered into a *Stipulation for Settlement and Consent Final Judgment*. [*See* Exhibit "A" with attached Exhibit "I"]. This is known as a Coblentz agreement. A party (here the ASSOCIATION as assignee of CYPRESS and VINELAND's rights against ST. PAUL) can recover against an insurer under a *Coblentz* agreement if the party seeking coverage proves coverage, a wrongful refusal to defend, and that the agreement was objectively reasonable and made in good faith. *Sinni v. Scottsdale Ins. Co.*, 676 F. Supp.2d 1319, 1324 (M.D. Fla. 2010). A consent judgment alone does not establish coverage; instead, coverage is determined by the actual facts. *Id.* However, in the determination of coverage, the insurer cannot raise affirmative defenses that it could have raised on behalf of its insured in the underlying action; the insurer is bound by the settlement agreement or consent judgment as to those issues. *Id.* The insurer can, however, raise "coverage defenses or exclusions that appear on the face of the

policy." *Id.*

In *Sinni*, the insurer could not raise the affirmative defense of workers' compensation immunity in a garnishment proceeding against it, but could raise the workers' compensation exclusion in the policy. *Sinni*, 676 F. Supp.2d at 1329-33. *See also Florida Farm Bureau Mut. Ins. Co. v. Rice*, 393 So. 2d 552 (Fla. 1st DCA 1980) (insurer allowed to litigate application of policy exclusions).

ST. PAUL can challenge the consent final judgment on the grounds that the settlement was not reasonable and not made in good faith. In Florida, to enforce a *Coblentz* agreement against an insurer, the party seeking coverage must show that the insurer was unjustified in failing to defend, that there is coverage and that the agreement is reasonable and was made in good faith. *Chomat v. N. Ins. Co. of New York*, 919 So. 2d 535, 537 (Fla. 3d DCA 2006). The party seeking to recover under a consent judgment initially has the burden to make a *prima facie* showing of reasonableness and lack of bad faith, but the insurer has the ultimate burden of proof. *Chomat*, 919 So. 2d at 537. The elements of reasonableness and good faith must both be present. *Mid-Continent Cas. Co. v. Am. Pride Bldg. Co., LLC*, 534 Fed. Appx. 926, 928 (11th Cir. 2013).

### 1. The ASSOCIATION cannot satisfy the "reasonableness" element in meeting its initial burden of proof

The test of whether a settlement is reasonable is what a reasonably prudent person in the position of the defendant would have settled for on the merits of the plaintiff's claim. *Wrangen v. Penn. Lumbermans Mut. Ins. Co.*, 593 F. Supp.2d 1273, 1279 (S.D. Fla. 2008). Relevant factors are the extent of the plaintiff's injuries,

the degree of certainty of the alleged tortfeasor's liability, the risks of going to trial, the chance a jury verdict might exceed the settlement offer, the size of the settlement in comparison with damages awarded in other cases and the expected expense of a trial defense. *Id.* (citing *Home Ins. Co. v. Advance Machine Co.*, 443 So. 2d 165 168 (Fla. 1st DCA 1983)). Thus, even though an insurer may not be able to re-litigate its insured's liability, the insurer will be allowed to inquire "into the underlying facts concerning causation and liability." *Id.* at 1280.

Here, the ASSOCIATION cannot satisfy the reasonableness element when seeking to recover from ST. PAUL. The amount is not reasonable because it is not and cannot be apportioned in any fashion under this record. There is no evidence of when covered damage happened, what covered damage happened, and the value of any covered damage.

In particular, there is simply no valuation evidence in the record. The deposition testimony of the corporate representatives of the Defendants shows that they have no knowledge or understanding regarding how the $2.5 million Consent Final Judgment was calculated. They attempted to defer to the expert reports. However, the expert reports are also silent on these issues. [*See* Exhibit "A" at p. 99, l. 3-9; Exhibit B at p. 24, l. 5-16]. The parties to the Consent Final Judgment made no apportionments with respect to the damages, and did not ask their expert to do so, either. [Exhibit "B" at p. 99, l. 1-13].

## 2. THE ASSOCIATION did not satisfy the requirement of good faith/the absence of collusion

An insurer may attack the plaintiff's settlement with the insured as made in bad faith by arguing that the settlement contains a false claim or was the product of collusion. *Chomat*, 919 So. 2d at 538. An agreement "becomes collusive when the purpose is to injure the interest of an absent or nonparticipating party, such as an insurer." *Monticello Ins. Co. v. City of Miami Beach*, 06-20459-CIV, 2008 WL 906537 (S.D. Fla. 2008) (quoting *Cont'l Cas. Co. v. Hempel*, 4 Fed. Appx. 703, 717 (10th Cir. 2001)). "Among the indicators of bad faith and collusion are unreasonableness, misrepresentation, concealment, secretiveness, lack of serious negotiations on damages, attempts to affect the insurance coverage, profit to the insured, and attempts to harm the interest of the insurer." *Id.* They have in common unfairness to the insurer. *Id.*; *see also Steil*, 448 So. 2d at 592 ("The real concern… is that the settlement… may not actually represent an arm's length determination of the worth of the plaintiff's claim."); 14 Couch on Ins. § 202:9 ("[P]ublic policy considerations…disfavor fraudulent or collusive settlements, such as those in which an insured concedes liability in situations where it is not liable").

Here, the amount of the consent final judgment and the circumstances leading up to it point to collusive character**.** The ASSOCIATION's corporate representative admitted that the ASSOCIATION determined the amount of the consent judgment upon recognizing that CYPRESS was a single LLC with no assets "and that going through the insurance [company] was the only option to recover any funds." [Exhibit "C" at p. 23, l. 21-25; p. 24, l. 1.] Defendant's expert, Mr. Norris,

testified that he would not have expected anyone to have to conduct any maintenance in 2001 and 2002 on the apartments because the buildings were brand new construction, indicating no liability on the part of CYPRESS and VINELAND. [Exhibit "C" at p. 90, l. 14-22].   The ASSOCIATION's own expert professional engineer was not asked to prepare a repair cost estimate. [Exhibit "C" at p. 98, l. 21-25; p. 99, l. 1-13].

In *American Pride*, the Eleventh Circuit affirmed the trial court's finding that a *Coblentz* agreement was unenforceable under Florida law.   *Am. Pride*, 534 Fed. Appx. at 927.   At trial, the jury had answered "No" to this jury instruction: "Do you find the consent judgment entered into by American Pride was reasonable in amount and not tainted by bad faith, fraud, collusion or without any effort to minimize liability?"   The Eleventh Circuit held that the instruction, using the conjunctive "and," was a correct statement of Florida law.   Because the jury said this did not happen, the consent judgment was unenforceable.   *Id.* at 928.

### F. The ASSOCIATION also carries the initial burden to apportion damages between covered and non-covered claims

The amount of the Consent Final Judgment is $2.5 million.   However, the parties who entered into the Consent Final Judgment cannot explain how the amount was calculated, and the Consent Final Judgment did not apportion damages whatsoever.   The parties to a consent judgment are bound by the facts that exist at the time.   There was not an expert report that the ASSOCIATION relied upon that apportioned damages whatsoever with respect to the condominiums.   [Exhibit "C" at p. 98, l. 21-25; p. 99, l. 1-13].

Defendants in this case have not produced any evidence apportioning between covered and non-covered damages under the ST. PAUL policies. Defendants' expert testified that he was not asked to perform any sort of repair cost estimate. [Ex. "C" at p. 98, l. 21-25; p. 99, l. 1-13. Defendants have not produced any scope of repair costs in this case.

The duty to indemnify depends upon the facts underlying the settlement agreement. *Hatmaker v. Liberty Mut. Fire Ins. Co.* 308 F.Supp.2d 1308, 1313 (M.D. Fla. 2004). When the ASSOCIATION entered into the Consent Final Judgment with CYPRESS and VINELAND, the ASSOCIATION relied upon a 2008 Field Report from Paul J. Ford and Company, a 2009 report from Marcon Forensics and the 2012 Morrison report. [Exhibit "B" at p. 19, l. 3-6; p. 20, l. 19-23]. None of these reports, however, discusses when any "property damage" began or other otherwise apportions damages between covered and non-covered damages. They also do not place a value on the damages. Not until the 2014 Morrison report did anyone talk about when damages even might have happened. Despite its reliance upon the 2012 Morrison report, which was silent on this point, the 2014 Morrison report expresses an opinion that "[t]he resultant damage from the defects would likely have progressed sufficiently to have been discoverable within 1-2 years following original construction."[3]

---

[3] This vague and incomplete opinion is insufficient to properly apportion the presence and valuation of covered damages. Moreover, it is not clear that this is Mr. Norris' opinion in the first place, as he admitted that the Defendants' attorney assisted in the wording of his opinion with respect to the timing of the property damage for his 2014 Morrison report. [Exhibit "C" at p. 21, l. 14-25; p. 22, l. 1-4.

## 1. Defendants fail to apportion damages according to when the alleged damages occurred

There is no temporal apportionment of damages in the Consent Final Judgment. [Doc. 34-13].  Moreover, Mr. Norris admitted that he cannot apportion the damages in terms of location and extent of the damages back in 2000, 2001 and 2002:

> Q.      All right.   Previously we had talked about the extent and scope of damages.  My understanding was that you were not in a position to tell me what damages had transpired and the extent of those damages in the year 2000, 2001 and 2001 [sic]?
>
> A.      Correct, I can't tell exactly where the damage would have been located, exactly what the extent would be. What I can tell you is exactly the opinion that's in my report, that within one to two years, my opinion is there would have been discoverable damage.

[Exhibit "C" at p. 56, l. 16-25].

The fact that Defendants' expert cannot opine as to the extent of the damage is fatal to their claim.   Defendants cannot meet their burden to show covered "property damage."   *See Trovillion*, at *9.  In *Trovillion*, the Middle District Court of Florida held that the party seeking insurance coverage bears the burden to prove coverage when seeking to collect from a consent judgment.   In that case, the insured was not relieved of its duty to apportion damages, and its failure to make any effort to do so or to produce evidence suggesting it was capable of doing so was fatal to its indemnification claim.   *Id.*

Moreover, in forming his opinions, Mr. Norris did not acknowledge, address or rely upon the conversion report conducted in 2004 by Asset Advisory Services, Inc., which did not observe any water intrusion damage issues in 2004. [Exhibit "C" at p. 65, l. 19-25; p. 66, l. 1-3].

The fact that the ASSOCIATION did not obtain bids and did not retain an expert to calculate total damages and the amount of the $2.5 million Consent Final Judgment is fatal to the ASSOCIATION's case. The fact that the Rule 12(b)(6) corporate representatives of the ASSOCIATION, CYPRESS and VINELAND have no working knowledge of how the amount was selected raise serious questions concerning whether CYPRESS and VINELAND entered into the agreement with the ASSOCIATION reasonably and in good faith. *See Wrangen*, 593 F. Supp.2d at 1279 (citing *Steil*, 448 So. 2d at 592) (explaining that settlement of liability may have little relationship to the strength of a plaintiff's claim where the insured may never be obligated to pay and has little to lose if he stipulates to a large sum with the plaintiff). Moreover, CYPRESS and VINELAND did not assume any payment obligations toward the $2.5 million Consent Final Judgment.

### 2. Defendants fail to apportion between covered and non-covered damages

In addition, there is no apportionment regarding the extent to which the damage was caused by architectural design flaws, defective construction and negligent maintenance issues. [Doc. 34-13]. The Consent Final Judgment states that the $2.5 million represents "the reasonable allocation of the total cost of repair based CYPRESS and VINELAND'S *potential* apportionment of fault for the property

damage at Cypress Fairway." [Doc. 34-13, ¶ 5.1]. (Emphasis added).

### G. Applicability of the Limitation Of Coverage to First Manifested Property Damage Endorsement

Even if the Court were to find that "property damage" was caused by an "event" and happened during ST. PAUL'S policy periods, the second St. PAUL policy, effective from December 31, 2000 to December 31, 2001, and the third ST. PAUL policy, effective from December 31, 2001 to December 31, 2002, have a Limitation Of Coverage to First Manifested Property Damage Endorsement. Dating the damages, therefore, is crucial to Defendants' effort to show actual coverage. They have failed to do so.

No Florida appellate courts have addressed the Limitation Of Coverage to First Manifested Property Damage Endorsement. A court in the Western District of Washington has addressed it, however. *See Bayley Construction v. American Guarantee and Liability Ins. Co.*, 2010 WL 4272454 (W.D. Wash. 2010).

The *Bayley Construction* court found that Travelers' First Manifested Property Damage Endorsement was not ambiguous. In doing so, the court also found that the anti-stacking language applied to the alleged continuous damage, which was water intrusion, so that the Travelers policies that followed the policy under which Travelers paid out toward settlement did not apply. *Id.* at *4. The court quoted an expert for one of the other insurers who conceded that the water intrusion, as a result of improper detailing, including sealants, flashings and so forth, all resulted from substantially the same type of construction defect. The other insurer conceded there was only one occurrence. Travelers paid out on the policy covering the time period when the building

was completed, and the court observed that the subsequent damage "was a continuation of that damage." *Id.* at *5.

The endorsement defines "first manifested" with respect to any protected person as "first known, or first in a condition where it reasonably should have been known by that other protected person or by you."  The plain language of the First Manifested Endorsement says that it limits coverage to only one policy if there are successive policies, except for an excess policy which may apply over the primary policy in effect during the happening of the property damage that could be implicated because of continuous, changing or resuming property damage.

To the extent that the property damage was continuous, changed or resumed, the First Manifested Property Damage Endorsement applies, so that no other policy will follow the policy period when the damages occurred.

## IV.    Conclusion

Defendants in this case have failed to produce any evidence indicating that "property damage" occurred or happened during the ST. PAUL policy periods and therefore cannot prove coverage.  *See Trovillion* at *7. More importantly, even if the Defendants could demonstrate that some covered property damage occurred during the Policies, their inability to apportion the amount of the Consent Final Judgment between covered and uncovered damages is fatal to their indemnification claim. *See Keller Indus., Inc. v. Emp'rs Mut. Liab. Ins. Co. of Wis.,* 429 So. 2d 779, 780 (Fla. 3d DCA 1983).  Even though the Defendant's expert opined that "property damage" had likely begun within the first year or two of completion, his report contains no evaluation of when construction defects began to cause particular damage.

Whatever scintilla of evidence that might be contained in Mr. Norris' 2014 Morrison report does not create a genuine issue of material fact precluding summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986).

WHEREFORE, ST. PAUL requests entry of final judgment in its favor and against Defendants declaring that ST. PAUL has no duty to defend and no duty to indemnify the ASSOCIATION, CYPRESS and VINELAND, and that the Consent Final Judgment for $2.5 million is unenforceable under Florida law.

Respectfully submitted,

_____
R. STEVEN RAWLS, ESQ.
Florida Bar No.:  0938254
srawls@butlerpappas.com
RYAN K. HILTON, ESQ.
Florida Bar No.: 0304610
rhilton@butlerpappas.com
Secondary:  eservice@butlerpappas.com
BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP
777 S. Harbour Island Boulevard
Suite 500
Tampa, Florida  33602
Telephone:   (813) 281-1900
Facsimile:    (813) 281-0900
Attorneys For Plaintiff, St. Paul Fire & Marine
Insurance Company

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

_____

RYAN K. HILTON, ESQ.