UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**ST. PAUL FIRE & MARINE INSURANCE COMPANY**,

    Plaintiff,

v.                                     **Case No.: 6:13-cv-01088-Orl-31TBS**

**CYPRESS FAIRWAY CONDOMINIUM ASSOCIATION, INC.**, **CYPRESS FAIRWAY LTD.**, a Florida Limited Partnership Company; and **VINELAND PARTNERS, L.L.C.**,

    Defendants.

**NATIONWIDE MUTUAL FIRE INSURANCE COMPANY,**

    Plaintiff,

                                      **Case No. 6:13-cv-1565-Orl31TBS**

v.

**CYPRESS FAIRWAY CONDOMINIUM ASSOCIATION, INC.**, **CYPRESS FAIRWAY LTD.**, a Florida Limited Partnership Company; and **VINELAND PARTNERS, L.L.C.**,

    Defendants.

## DEFENDANTS' OPPOSITION TO PLAINTIFF ST. PAUL FIRE & MARINE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT

### I. Introduction.

Defendant Cypress Fairway Condominium Association, Inc. ("Association") is a multi-family residential community consisting of 384 residential units. In

2010, the Association filed a lawsuit hoping to recover for the extensive property damage discovered at the project. Five years later, as the buildings at Cypress Fairway continue to deteriorate, the 384 owners ask for nothing more than the opportunity to present their case.

Defendants have satisfied their burden with respect to all elements for which they bear the burden. St. Paul cannot establish that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Defendants ask that St. Paul's motion be denied. Because St. Paul also cannot establish that it has an applicable exclusion, Defendants ask that the court grant summary judgment in their favor.

## II. Legal Standard.

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact. *Sinni v. Scottsdale Insurance Company*, 676 FSupp2d 1319, 1322 (M.D. Fla. 2010) (*citing Beal v. Paramount Pictures Corp.*, 20 F3d 454, 458 (11th Cir. 1994)). The moving party bears the burden of showing that no genuine issue of material fact exists. *Sinni* at 1322 (*citing Celotex Corp. v. Catrett*, 477 US 317, 323, 106 SCt 2548, 91 Led2d 265 (1986)). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Sinni* at 1322 (*citing Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255, 106 SCt 2505 (1986)). In order to shift its burden, the moving party must point out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial. *Sinni* at 1322.

With respect to interpretation of insurance policies, Florida law is well settled that insuring or coverage clauses are to be construed in the broadest possible manner to effect the greatest extent of coverage. *Adolfo House Distributing Corp. v. Travelers Property and Casualty Insurance Co.*, 165 FSupp2d 1332, 1336 (S.D. Fla. 2001). Insurance policy exclusions are construed in the narrowest possible manner, again with an eye toward maximizing the coverages afforded. *Id.*

### III. Legal Analysis.

This court has established the elements of a claim under a *Coblentz* style agreement. A party seeking to recover must prove: (1) coverage; (2) a wrongful refusal to defend; and (3) that the settlement was objectively reasonable[1] and made in good faith. *Sinni v. Scottsdale Ins. Co.*, 676 FSupp2d 1319, 1324 (M.D. Fla. 2010). The party seeking to recover has the initial burden of proving that its underlying claim against the insured was within the coverage of the policy. With respect to the coverage element, a party seeking recovery must establish a duty to defend and a duty to indemnify. With respect to the final element, a claimant has the burden of production sufficient to make a *prima facie* showing of reasonableness and lack of bad faith. *Wrangen v. Pennsylvania Lumbermans Mutual Ins. Co.*, 593 FSupp2d 1273, 1279 (S.D. Fla. 2008). The ultimate burden of proof rests with the insurer. *Id.*

---

[1] There appears to be some conflicting authority. In *Galen Health Care, Inc. v. American Casualty Company of Reading, Pennsylvania*, 913 F Supp 1525, 1533 (M.D. Fla 1996), the court held that "Under Florida law a primary carrier who has the duty to defend its insured, and who refuses to do so, cannot later challenge the reasonableness of the settlement or deny the liability of its insured following judgment against the insured." *See also Florida Farm Bureau Mutual Insurance Company v. Rice*, 393 So2d 552 (Fla. 1st DCA1980) ("Nor can the insurer here be heard to complain of the reasonableness of the consent judgment entered below without the insurer's participation. Here again, its failure to assume its contractual obligations was voluntary and undertaken with full appreciate of the risk involved.").

### A. St. Paul Conceded its Duty to Defend Cypress.

St. Paul asks for summary judgment for, among other things, that it owed no duty to defend Cypress or Vineland. (St. Paul Brief, p.2). St. Paul's position today conflicts with its previous admission that the underlying lawsuit triggered its defense for Cypress. Attached as Exhibit 1 is a letter from St. Paul, which states "Based upon the following analysis, Travelers is obligated to defend Cypress Fairway Ltd. but not Vineland Partners, LLC in the Cypress Fairway litigation." (Affidavit of Daniel R. Webert, Exhibit 1). St. Paul has already admitted that the allegations triggered its defense. The problem for St. Paul is that its defense came too late. As set forth more fully below, the belated acknowledgment was not timely. Now that St. Paul may be subject to liability for the consent judgment, its only option is to flip to the position that it owed no defense. In light of its admission, however, the issue of whether a defense was triggered is not in dispute.

Even if St. Paul did not concede its defense obligation, the policies nonetheless obligated St. Paul to defend Cypress. The St. Paul policies contain an additional insured endorsement obligating St. Paul to defend "owners" pursuant to contract. (Affidavit of Daniel R. Webert, Exhibit 16, pp. 1, 6 (1999); 7,10 (2000); 12, 17 (2001)). Pursuant to WPC's contract, it was obligated to provide additional insured coverage for Cypress. (Affidavit of Daniel R. Webert, Exhibit 2, p. 1, 5-7).

### B. St. Paul Had a Duty to Defend Vineland.

In its letter conceding its defense to Cypress, St. Paul denied any defense obligation in favor of Vineland. Defendants disagree with this position. It is well settled law in Florida that a liability insurer's duty to defend is controlled by the bare <u>allegations</u> in the complaint against the insured. *Sphinx International, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA*, 226 FSupp2d 1326

(M.D. Fla. 2002). (*citing Limited Partnership v. St. Paul Fire and Marine Ins. Co.*, 786 So2d 1204, 1206 (Fla. 3d DCA 2001)). Any ambiguity in the complaint as to whether coverage is created must be construed against the insurance company. *Id* (*citing Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.*, 470 So.2d 810 (Fla. 1st DCA 1985)).

The complaint tendered to St. Paul alleged that Vineland was an owner and/or that it controlled the actions of Cypress as the owner. (Affidavit of Daniel R. Webert, Exhibit 3, p. 25). WPC was obligated to procure additional insured coverage for the owner of the project. (Affidavit of Daniel R. Webert, Exhibit 2, pp. 5-7). The St. Paul policies likewise obligated St. Paul to cover the owner as required by contract. Because the allegations of the complaint control, St. Paul was obligated to defend Vineland based on the allegations in the complaint.

St. Paul was also obligated to defend Vineland based on the contractual indemnity provision of the WPC contract. Pursuant to this provision, WPC was obligated to indemnify, defend, protect and hold harmless the owner and its officers, directors, shareholders, partners, representatives, agents and employees. (Affidavit of Daniel R. Webert, Exhibit 2, p.5). Vineland was identified as an agent of Cypress. (Affidavit of Daniel R. Webert, Exhibit 2, p. 3). St. Paul agreed to defend any person that WPC had an obligation to defend pursuant to a contract. (Affidavit of Daniel R. Webert, Exhibit 16, pp. 1-5 (1999); 7-9 (2000); 12-16 (2001)). At worst, the allegations are ambiguous as to whether Vineland was entitled to coverage; St. Paul's defense was therefore triggered.

### C. St. Paul's Defense Was Untimely and Therefore Constitutes a Wrongful Denial.

Cypress and Vineland tendered their defense on December 26, 2012. (Affidavit of Daniel R. Webert, Exhibit 4). St. Paul's first acknowledgment of the tender was dated January 21, 2013. (Affidavit of Daniel R. Webert, Exhibit 5). St. Paul next communicated on June 11, 2013, 167 days after the tender. (Affidavit of Daniel R. Webert, Exhibit 1). In that letter, St. Paul acknowledged that it owed a duty to defend.

Florida law requires certain actions of an insurer when responding to a tender from an insured. An insurer is required to act promptly in communicating with an insured. Fla. St. 626.9541(1)(i). An insurer loses the ability to deny coverage based on a particular coverage defense unless within 30 days after the liability insurer knew or should have known of the coverage defense, written notice of reservation of rights is given to an insured and within 60 days of compliance or receipt of a summons and complaint, an insurer must refuse to defend, obtain a nonwaiver agreement from the insured, or retain independent counsel.

Cypress and Vineland tendered their defense. In the tender, they specifically referenced that a consent judgment may be necessary without a defense. (Affidavit of Daniel R. Webert, Exhibit 4). They waited nearly five months before entering a consent judgment with the Association. (Affidavit of Daniel R. Webert, Exhibits 6-7). St. Paul had ample time to determine whether it owed a duty to defend. In fact, it had more than five times the period identified in Fla. St. 627.426(2)(a). It is worth noting that St. Paul was no stranger to the Cypress Fairway litigation. In fact, St. Paul was already defending the general contractor WPC in the underlying litigation and had already *settled* claims valued at more than $463,646 between

6

June and September of 2012. (Affidavit of Daniel R. Webert, Exhibits 8-10). Despite St. Paul's familiarity with the litigation, settlement of prior claims, Florida's requirements for insurer responses, and Cypress and Vineland's specific recitation that a consent judgment may be necessary, St. Paul left Cypress and Vineland twisting in the wind for 167 days. St. Paul's conduct constitutes a de facto denial[2], justifying Cypress and Vineland's decision to protect themselves by entering into the settlement agreement.

### D. The Settlement Was Objectionably Reasonable and Made in Good Faith.

#### 1. St. Paul's Argument Regarding Valuation Belies St. Paul's Actions.

St. Paul spends considerable time arguing that the consent judgment is unreasonable because there is "no valuation evidence in the record." (St. Paul Brief, p. 17). St. Paul also argues that the amount of the consent judgment is "collusive." (St. Paul Brief, p. 18). In light of St. Paul's conduct in the underlying litigation, its arguments are curious.

Like St. Paul's failure to mention that it belatedly accepted the defense of Cypress, St. Paul also fails to mention that it defended and settled the underlying litigation on behalf of general contractor WPC. St. Paul paid pursuant to a $1.1 million settlement with WPC. (Affidavit of Daniel R. Webert, Exhibits 8-9). St. Paul's settlement payment was based on a mutual settlement agreement and accompanying *Coblentz* agreement. (Affidavit of Daniel R. Webert, Exhibit 8-9). As part of the agreement, WPC and the Association "agree[d] that the reasonable

---

[2] Florida courts have recognized a *de facto* denial of an insurance claim based on an insurer's delay in responding to an insured's tender. *See Cypress Chase Condominium Association v. QBE Insurance Corp.*, Case No. 10-61987-CIV-COHN/Otazo-Reyes. (Affidavit of Daniel R. Webert, Exhibit 11).

amount of monetary damages reasonably suffered by the Association to which the Association is entitled, total $15 million." (Affidavit of Daniel R. Webert, Exhibit 8, p.5). WPC also consented to a $9.9 million consent judgment for damages suffered by the Association. (Affidavit of Daniel R. Webert, Exhibit 8, p.6).

St. Paul's payments pursuant to the *Coblentz* agreement is a clear sign of its assent to that agreement. The settlement could not have happened without the consent of St. Paul. St. Paul therefore conceded that the Association incurred $15 million in damage and agreed to a $9.9 million consent judgment, which is just under four times the amount of the consent judgment entered into by Cypress and the Association. St. Paul resolved its risk and its insured's liability by giving a consent judgment for four times the amount of Cypress's consent judgment, yet now, in a double standard, asks the court to find that Cypress was unreasonable and collusive.

It should also be noted that St. Paul argues that the Association and Cypress did not act in good faith for, among other things, attempting to influence other insurers and attempts to harm the interests of other insurers. (St. Paul Brief, p.18). Again, in the *Coblentz* agreement consented to by St. Paul on behalf of WPC, WPC agreed to assign all rights and claims relating to the action, including against non-defending and/or non-indemnifying insurers. (Affidavit of Daniel R. Webert, Exhibit 8, p. 4-5). St. Paul asks the court to find that the Association and/or Cypress acted in bad faith and/or engaged in collusion for entering into the same agreement used by St. Paul to get its insured out of harm's way in the underlying litigation.

8

## 2. The Settlement Was Reasonable and in Good Faith.

Even if St. Paul did not concede $15 million in damages or enter into a $9.9 million *Coblentz* agreement, at a minimum there is a genuine issue of material fact as to whether the settlement was reasonable and entered into in good faith.

Michael Kean represented Cypress and Vineland in the underlying action. (Affidavit of Daniel R. Webert, Exhibit 12, pp. 1-2). Mr. Kean believed that the overall repair costs were in the 15 to 20 million dollar range. (Affidavit of Daniel R. Webert, Exhibit 12, pp. 10-13). In his evaluation, Mr. Kean relied on the Association's expert reports, conversations with other defendants' attorneys, and in house expert advice. (Affidavit of Daniel R. Webert, Exhibit 12, pp. 10-13). The in house expert for Cypress was involved with the construction of the project and interacting with architects, engineers, contractors, and subcontractors. (Affidavit of Daniel R. Webert, Exhibit 12, p.12). Mr. Kean also engaged in an analysis of the claims against the developer. He recognized that the developer may have third party claims, but that many of those entities were out of business. Based on Mr. Kean's experience, there was concern that his client would get tagged for the entire $15 to $20 million repair. (Affidavit of Daniel R. Webert, Exhibit 12, pp. 11-12).

According to Mr. Kean, the parties did not immediately agree on a number. Discussions took place over a significant period of time (Affidavit of Daniel R. Webert, Exhibit 12, pp. 3-6). Mr. Kean discussed the number in house with one of Cypress's employees, while going through the expert reports and evaluating the overall liability picture. (Affidavit of Daniel R. Webert, Exhibit 12, p.4). The discussions with counsel related to finding a reasonable number that estimated the

damages and the potential repair costs (Affidavit of Daniel R. Webert, Exhibit 12, pp. 4-5). Mr. Kean recalls discussing numbers significantly higher and lower than the eventual $2.5 million in the consent judgment (Affidavit of Daniel R. Webert, Exhibit 12, pp.5-6).

Before executing the agreement, Cypress and Vineyard tendered to all of the carriers it could locate. As part of the tender, Cypress and Vineyard specifically indicated that without a defense, they may have to enter into a consent judgment. (Affidavit of Daniel R. Webert, Exhibit 4). The parties then gave the insurers the opportunity to defend Cypress and/or Vineland. When they did not, Cypress and Vineland had little choice but to enter into the consent judgment.

With respect to the good faith of the Association, St. Paul again only provides a portion of the story. St. Paul indicates that the Association's corporate representative determined the amount of the consent judgment "upon recognizing that Cypress was a single LLC with no assets." (St. Paul Brief, p. 18). St. Paul also states that the corporate representatives "have no knowledge or understanding regarding how the $2.5 million Consent Final Judgment was calculated." (St. Paul Brief, p.17). Ms. Ramos, the Association's corporate representative, continually testified that the Association relied on the advice and recommendations of counsel and its expert in deciding to settle with Cypress and Vineland. (Affidavit of Daniel R. Webert, Exhibit 13, pp. 1-6). It is axiomatic that parties are allowed to rely on their counsel in determining the amount and basis for settlement. St. Paul's statement that the Association "had no knowledge or understanding" of the consent judgment is false. The Association's knowledge and understanding came from its counsel and from its expert. (Affidavit of Daniel R. Webert, Exhibit 13, pp. 1-6).

Prior to and during the discussions of settlement, counsel for the Association reviewed expert Chris Norris' expert investigation (including approximately fifty openings) and Mr. Norris' anticipated scope of repair. (Affidavit of Daniel R. Webert, paragraph 4). During settlement negotiations, Mr. Webert discussed this cost of repair range with counsel for WPC, Todd Norman (counsel for WPC), and WPC's expert, who agreed in person and in the ultimate settlement documents that a reasonable repair would be in the range of eleven to fifteen million dollars. Later, Mr. Webert had similar discussions with counsel for Cypress Fairway and Vineland, Michael Kean, who acknowledged, based on his experience and analysis of the legal and factual issues, that (a) repairs could reasonably run in the range of fifteen to twenty million dollars, and (b) a favorable allocation to his client would be $2.5 million, discounted from the total cost of repair. Over time, Mr. Kean negotiated the $2.5 million allocation down from higher numbers that the Association proposed. (Affidavit of Daniel R. Webert, paragraph 5).

Defendants have satisfied their burden of establishing a *prima facie* case that the settlement was reasonable and not entered into in bad faith.

### E. St. Paul Has a Coverage Obligation for the Judgment.

### 1. St. Paul Erroneously Shifts its Burden.

St. Paul contends that it owes no coverage obligation because the Association fails to apportion damages within St. Paul's policy periods. St. Paul argues that Defendants "cannot meet their burden." (St. Paul Brief, p.21). Defendants disagree that this is their burden. Florida law establishes that the burden is on St. Paul:

> In its brief, Universal contends that the insured has the burden of proving that the loss occurred within the policy period. Because the insureds could not determine when the loss occurred, they failed in meeting their burden. While it is certainly true that the insured must prove the essential elements of its cause of action at trial, on a motion for summary judgment, it is Universal's burden to prove the nonexistence of a material fact. In this case, it was Universal's burden to conclusively prove that the loss did not occur during the policy period.

*Vander Voort v. Universal Property & Casualty Ins. Co.*, 127 So.3d 536 (Fla. 4th DCA 2012).

St. Paul argues that the Defendants have not allocated the consent judgment and therefore St. Paul is entitled to summary judgment. St. Paul again improperly shifts the burden to Defendants. Defendants have not allocated for a simple reason: they believe that the entire amount is covered by St. Paul. There is no reason to allocate because St. Paul is responsible for the entire $2.5 million judgment. Under these circumstances, the burden is on St. Paul to prove there is no coverage.

In *U.S. Concrete Pipe Company v. Bould*, the Supreme Court of Florida addressed the issue of allocation. The court held:

> If a judgment includes elements for which an insurer is liable and also elements beyond the coverage of the policy, the burden of apportioning or allocating these damages is on the party seeking to recover from the insurer. On the other hand, if the evidence raises a question as to whether the entire claim is beyond the coverage of the policy, the burden is upon the insurer to show that there is no coverage. Non-insurability is a defensive matter, with the burden resting on the insurer.

*Bould*, 437 So.2d 1061 (Fla. 1983). If St. Paul is contending that it owes no coverage, it has the burden to establish that there is no coverage. If St. Paul concedes that there is some coverage under its policy, Defendants have met their

12

1055215

burden to establish that St. Paul has an indemnity obligation and summary judgment should be denied.

## 2. The Entire Consent Judgment is Covered.

Even if St. Paul did not have the burden, Defendants have met their burden with respect to St. Paul's indemnity obligation. According to Defendants' Expert Disclosure, Defendants' expert is prepared to testify as follows:

> ·The progression of damage would have started immediately upon construction completion with continuation through the present date.
>
> ·The defective conditions would have been discoverable at any point in the history of this project.
>
> ·The resultant damage from the defects would likely have progressed sufficiently to have been discoverable within one to two years following original construction.
>
> ·Complete removal of exterior cladding is necessary to implement repairs due to the systemic nature of the building envelope defects and resultant property damage.
>
> ·These repairs would have been necessary to remediate and prevent further property damage as soon as the progression of property damage began, and as a result of continuing property damage prior to implantation of required repairs.

Affidavit of Daniel R. Webert, Exhibit 14. Certificates of occupancy were issued from December 1999 to July 28, 2000. (Affidavit of Daniel R. Webert, Exhibit 15). St. Paul's policies ran from December 31, 1999 to December 31, 2002. Defendants' expert testimony establishes that property damage started occurring as soon as the first building was completed in December of 1999. That is also the date

13

of St. Paul's first policy. Defendants' Expert Disclosure also contains numerous photographs evidencing the type of property damage discovered at the project. (Affidavit of Daniel R. Webert, Exhibit 14, pp. 16 to 63). Defendants' expert testimony also establishes that property damage continued to the present date, meaning that property damage would have occurred in each of St. Paul's policies.

St. Paul discusses the triggers of coverage under Florida law. St. Paul argues that the "injury-in-fact trigger" applies. (St. Paul Brief, p. 13). An injury in fact trigger requires all insurers in which property damage has occurred during their policy period to provide coverage. "It is the damage itself which must occur during the policy period for coverage to be effective." *Trovillion Constr. & Dev. Inc. v. Mid-Continent Cas. Co.*, 6:12-CV-914-ORL-37, 2014 WL 201678, *8 (M.D. Fla. 2014) (*citing Trizec Props., Inc. v. Biltmore Constr. Co.*, 767 F.2d 810, 813 (11th Cir. 1985)). Defendants' expert establishes that property damage occurred in each of St. Paul's policy periods. As a result, St. Paul's policies are triggered.

Even if the court applies a manifestation trigger, St. Paul's policies are still triggered. Defendants' expert indicates that property damage would have been discoverable within one to two years of building completion[3]. Based on the certificates of occupancy, property damage would have been discoverable for the first building in December of 2000 (during St. Paul's first policy period) and at the latest by July of 2002 (during St. Paul's final policy period). In other words, property damage for each building at Cypress Fairways would have manifested during St. Paul's three policy periods.

---

[3] St. Paul attempts to cast aspersions on Defendants' counsel and/or expert by insinuating that Defendants' counsel influenced the expert opinion. (St. Paul Brief, p.14). St. Paul claim that counsel "assisted in the wording" of the report is not accurate. Defendants' expert testified that he and counsel discussed the language on the telephone but that all opinions were his own. (St. Paul Brief, p. 14). It is difficult to imagine a scenario where an expert report can be produced without a conversation between an attorney and the expert he has retained.

14

St. Paul makes several arguments regarding Defendants' expert. Among St. Paul's criticisms are that the expert could not describe "why cellulose in wood breaks down (because he is not a biologist)," that he has no expertise in the "microclimate of Orlando, Florida," and that "he is not a meteorologist." (St. Paul Brief, pp.14-15). St. Paul provides no context for these criticisms, including no basis or reasoning as to why an expert in the field of construction and construction defects would need to be a biologist or meteorologist. Apparently, St. Paul would like the court to ignore the opinion of a highly qualified engineer with extensive field experience (See Affidavit of Daniel R. Webert, Exhibit 14, Appendix B) because he is not a biologist or meteorologist. St. Paul's unsupported criticisms do not provide a sufficient basis to warrant summary judgment or to defeat Defendants' summary judgment.

### F.   St. Paul Has Not Carried its Burden With Respect to the First Manifestation Exclusion.

St. Paul's final argument is that is that the Limitation of Coverage to First Manifested Property Damage Endorsement may apply. According to St. Paul, Defendants have failed to date the damages. There is no question that the cited provision is a limitation on coverage. Under Florida law, insurers have the burden with respect to exclusionary language. *Adolfo House, supra*. St. Paul's argument that Defendants failed to prove that property damage "first manifested" during its policy inappropriately shifts St. Paul's burden. St. Paul has not established that the entirety of Defendants' claims fall within the coverage exclusion. As a result, St. Paul cannot carry its burden.

Even if the court determines that the burden is on Defendants, they have met their burden. First and foremost, the 1999 policy does not contain a First

15

1055215

Manifested endorsement. (St. Paul Brief, p. 23). Summary judgment is not appropriate in any event. With respect to the 2000 and 2001 policies, as discussed above, Defendants' expert testimony establishes that property damage would have been discoverable within one to two years of building completion. Based on the certificates of occupancy, property damage would have been discoverable between December of 2000 and July of 2002. In other words, all of the property damage would have first manifest during St. Paul's policy periods.

Finally, even if St. Paul is correct with respect to the 2000 and 2001 CGL policies, the First Manifested endorsement only applies to the liability coverage and not to the Umbrella policies issued by St. Paul. (Affidavit of Daniel R. Webert, Exhibit 16, pp. 11 (2000) and 18 (2001)). Summary judgment is therefore not appropriate.

### IV. Defendants' Cross Motion for Summary Judgment.

For the reasons set forth above, Defendants have met their burden with respect to all elements of enforcing their *Coblentz* agreement. Specifically, Defendants have met their burden that St. Paul owed a duty to defend, St. Paul wrongfully denied coverage, St. Paul has a coverage obligation, and that the settlement was reasonable and entered in good faith. St. Paul has not established that any policy exclusion applies. Defendants ask that the court grant summary judgment in their favor.

### V. Conclusion.

Defendants have met their burden on all elements for which they bear the burden. Defendants are therefore entitled to summary judgment. If the court is not satisfied that Defendants are entitled to summary judgment, Defendants have at

16

least made a *prima facie* case precluding St. Paul's motions for summary judgment. At a minimum, there are questions of fact that preclude summary judgment.

DATED: May 5, 2015.

Respectfully Submitted,

BARKER • MARTIN, P.S.

By:   */s/ James L. Guse*
James L. Guse, FL Pro Hac Vice
319 SW Washington Street, Suite 420
Portland, OR 97204
Telephone: (503) 796-9806 ext. 133
Facsimile: (503) 796-9807
Email: jguse@barkermartin.com

*Counsel for Defendants Cypress Fairway Condominium Association, Inc., Cypress Fairway Ltd., and Vineland Partners, L.L.C.*

WEAN & MALCHOW, P.A.

Ian Lylen, FL ID No. 827169
646 E Colonial Drive
Orlando, FL 32803-4603
Telephone: (407) 999-7780
Facsimile: (407) 999-5291
E-Mail: ijlylen@wmlo.com

*Co-Counsel for Defendants Cypress Fairway Condominium Association, Inc., Cypress Fairway Ltd., and Vineland Partners, L.L.C.*

# CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of the foregoing by:

☒ ECF – via the Clerk of the Court using the CM/ECF System which will send a notice of electronic filing

☐ First Class U.S. Mail

☐ E-mail (to those with email addresses listed below)

☐ Overnight delivery

all of whom are listed in the Service List below.

DATED: May 5, 2015.

BARKER • MARTIN, P.S.

By: */s/ James L. Guse*
James L. Guse, FL Pro Hac Vice
319 SW Washington Street, Suite 420
Portland, OR 97204
Telephone: (503) 796-9806 ext. 133
Facsimile: (503) 796-9807
Email: jguse@barkermartin.com

*Counsel for Defendants Cypress Fairway Condominium Association, Inc., Cypress Fairway Ltd., and Vineland Partners, L.L.C.*

WEAN & MALCHOW, P.A.

Ian Lylen, FL ID No. 827169
646 E Colonial Drive
Orlando, FL 32803-4603

Telephone: (407) 999-7780
Facsimile: (407) 999-5291
E-Mail: ijlylen@wmlo.com

*Co-Counsel for Defendants Cypress Fairway Condominium Association, Inc., Cypress Fairway Ltd., and Vineland Partners, L.L.C.*

**Service List**

**R. Steven Rawls**
**Ryan K. Hilton**
Butler, Pappas, Weihmuller Katz,
Craig LLP
777 S. Harbour Island Blvd, Suite 500
Tampa, FL 33602-5723
813.281.1900
813.281-0900 (fax)
srawls@butlerpappas.com
rhilton@butlerpappas.com
eservice@butlerpappas.com

*Attorneys for Plaintiff, St. Paul Fire &*
*Marine Insurance Company*